UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

NICOLE HARRIS et al.,

      Plaintiffs,

v.

COUNTY OF WAYNE and TERRI
GRAHAM,

      Defendants.

Case No. 23-10986
Honorable Laurie J. Michelson

---

**OPINION AND ORDER DENYING PLAINTIFFS' MOTION FOR CLASS
CERTIFICATION [42] AND DEFENDANTS' MOTION FOR SUMMARY
JUDGMENT [43]**

---

Plaintiffs—95 women who were formerly incarcerated at the Wayne County Jail—filed this putative class action under 42 U.S.C. § 1983, alleging that they were subjected to unconstitutional strip searches by officer Terri Graham between 2016 and 2022. (ECF Nos. 14, 27.) This case follows a series of putative class actions challenging the Wayne County Jail's strip-searching practices, the most recent of which was *Woodall v. County of Wayne*, No. 17-13707 (E.D. Mich. filed Nov. 14, 2017). There, the Sixth Circuit reversed a grant of class certification, *see Woodall v. Wayne County*, No. 20-1705, 2021 WL 5298537, at *4 (6th Cir. Nov. 15, 2021), and the case was dismissed after the four named plaintiffs settled their claims, *see Woodall*, No. 17-13707, ECF No. 186 (stipulating dismissal).

Now, the putative class members from *Woodall* who bring this suit have again moved for class certification. Plaintiffs seek to certify four classes of women: (1) those

strip searched in a group, (2) those strip searched in view of men, (3) those subject to derogatory comments by Graham during their strip search, and (4) those strip searched under unsanitary or unhygienic conditions. Defendants argue these are improper "fail-safe" classes and that Plaintiffs fail to satisfy the requirements of Federal Rule of Civil Procedure 23.

Defendants not only oppose class certification, but they have also moved for summary judgment: Graham argues she is entitled to qualified immunity and Wayne County argues that it is not subject to *Monell* liability.

For the same reasons the Sixth Circuit denied class certification in *Woodall*, the Court denies Plaintiffs' same request for class certification here. And because there are genuine issues of material fact as to qualified immunity and *Monell* liability, the Court denies Defendants' motion for summary judgment.

## I. Background

As the current Plaintiffs were putative class members in *Woodall* (ECF No. 14, PageID.88–89), some background on that case is helpful. *Woodall* also involved women formerly incarcerated at Wayne County Jail who filed suit under § 1983 alleging that they were subject to unconstitutional strip searches at the jail. *See Woodall*, No. 17-13707, ECF No. 1. The presiding district judge at the time granted class certification, but the Sixth Circuit reversed that decision on November 15, 2021. *Woodall v. County of Wayne*, No. 17-13707, 2020 WL 373073 (E.D. Mich. Jan. 23, 2020), *rev'd and remanded*, 2021 WL 5298537. More than a year later, on April 27,

2023, this Court dismissed the case with prejudice after the four individual Plaintiffs settled their claims. *Woodall*, No. 17-13707, ECF No. 186.

That same day, many putative class members from that case filed this suit, asserting similar factual allegations about humiliating strip searches they endured. (ECF No. 1; *see* ECF Nos. 11, 14.) More specifically, Plaintiffs again claim that Officer Terri Graham, who worked the registry at the Jail, strip-searched them in groups, made derogatory comments about their bodies, allowed men to see them being strip-searched, and maintained an unsanitary environment. (ECF No. 14, PageID.108–109.) And because many women claim they were subject to similar strip searches, Plaintiffs again accuse Wayne County, the municipality in charge of the Jail, of ignoring a pattern of constitutional violations and failing to train its officers or otherwise address the issue, thereby allowing the violations to continue. (*Id.* at PageID.109–110.)

After amending their complaint twice (*see* ECF Nos. 11, 14), a total of 126 women alleged, as in *Woodall*, that Graham violated the Fourth Amendment's prohibition on unreasonable searches and that the County is also liable for these violations under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). (ECF No. 14.) The Defendants moved to dismiss some or all of the Plaintiffs based on statute of limitations issues. (ECF No. 20.) The Court granted this motion in part, finding that claims that accrued prior to April 27, 2016, were time barred. (ECF No. 27, PageID.322.) Accordingly, the Court dismissed the 26 Plaintiffs who were released from jail before April 27, 2016, and therefore could not have been strip-searched

3

within the actionable time frame.  (*Id.*) The Court also determined that Plaintiffs are barred from bringing a class action for claims that accrued prior to April 27, 2020. (*Id.* at PageID.312.) The parties then stipulated to the dismissal of five additional women (ECF Nos. 30, 34) leaving the suit with 95 named Plaintiffs.

Now, ten of those Plaintiffs—Anson[1], Bell, Gross, Gulley, Hampton, May, Price, Stock, Tarrant, and Wilks—move for class certification. (ECF No. 42, PageID.1052.) The Plaintiffs propose the certification of four classes—"all females who were housed and/or detained by the Wayne County Sheriff at the Wayne County Jail on or after April 27, 2020, until the date of judgment or settlement of this case, who were": (1) "strip searched in a group with other detainees;" (2) "strip searched in view of members of the opposite sex;" (3) "subject to derogatory comments by Defendant Graham during strip searches;" and/or (4) "strip searched under unsanitary and/or unhygienic conditions, including being exposed to the bodily fluids of other detainees." (*Id.* at PageID.1051–1052.) They seek to certify these classes as to "the core legal question of whether or not Wayne County maintained a custom, practice, or policy that violated the Constitution," not as to damages. (*Id.* at PageID.1053.) Defendants oppose the motion. (ECF No. 53.)

In addition, Defendants filed a motion for summary judgment. (ECF No. 43.) Graham argues that she is entitled to qualified immunity and Wayne County argues

---

[1] Krista Anson passed away and the parties stipulated to substituting Debra Pace. (ECF No. 56.)

it is not liable under *Monell*, 436 U.S. at 694. (ECF No. 43, PageID.1529–1554). Plaintiffs oppose the motion. (ECF No. 51.)

The parties' briefs address the relevant issues and the Court dealt with most of them in *Woodall*. Thus, no further argument is needed. *See* E.D. Mich. LR 7.1(f). For the reasons that follow, both motions are denied.

## II. Motion for Class Certification

Start with the motion for class certification.

Before certifying a class, the Court must evaluate the factors set out in Rule 23 of the Federal Rules of Civil Procedure. First, a potential class must satisfy the prerequisites set forth in Rule 23(a): (1) numerosity; (2) commonality of facts and law; (3) typicality between the class claims and those of the named parties; and (4) adequacy of the representation by the named parties and class counsel. Fed. R. Civ. P. 23(a); *see Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982); *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 522 (6th Cir. 1976). The putative class must also meet one of the conditions in Rule 23(b) to confirm that a class action is more appropriate than multiple separate actions. Fed. R. Civ. P. 23(b); *Coleman v. Gen. Motors Acceptance Corp.,* 296 F.3d 443, 446 (6th Cir. 2002). And the Sixth Circuit is among those that reads an implied "ascertainability" requirement in Rule 23(b)(3), *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016), meaning the class definition must be "sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537–38 (6th Cir. 2012); *see also In re*

*OnStar Cont. Litig.*, 278 F.R.D. 352, 373 (E.D. Mich. 2011) ("[A] class definition should be based on objective criteria so that class members may be identified without individualized fact finding."). The parties seeking class certification bear the burden of showing that the requirements for class certification are met. *Bridging Cmtys. Inc. v. Top Flite Fin. Inc.*, 843 F.3d 1119, 1124 (6th Cir. 2016).

In evaluating these requirements, the Court is bound by the Sixth Circuit's class certification ruling in *Woodall* that addressed virtually identical issues.

### A. 23(a) Requirements

### 1. Numerosity

To establish numerosity, Plaintiffs must show "the class is so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs assert that there are "hundreds, if not thousands, of additional putative class members" (ECF No. 42, PageID.1062) and attach hundreds of declarations from putative class members (ECF No. 42-2). Defendants do not contest numerosity. (*See* generally ECF No. 53.) So this element is satisfied. *See Johnson v. ITS Fin. LLC*, 314 F.R.D. 441, 446 (S.D. Ohio 2015) ("Numerosity is generally met if the proposed class would include 'more than several hundred' plaintiffs. Here, [Plaintiff's] allegations—and Defendants' lack of response concerning this element—demonstrates that hundreds, if not thousands, of individuals would be part of the proposed class. Accordingly, the numerosity requirement is satisfied." (quoting *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 570 (6th Cir. 2004))).

### 2. Commonality

Next, Plaintiffs must show that "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). And, importantly, they must show those questions will "generate common answers apt to drive the resolution of the litigation." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011). "Commonality requires the plaintiff to demonstrate that the class members 'have suffered the same injury.'" *Id.* at 349–50 (quoting *Gen. Tel. Co.,* 457 U.S. at 157). "This does not mean merely that they have all suffered a violation of the same provision of law." *Id.* at 350. Rather, "[t]heir claims must depend upon a common contention . . . capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Id.*

Here, Plaintiffs assert that there are common questions of fact and law related to their *Monell* claim: "the core legal question of whether or not Wayne County maintained" an unconstitutional custom, practice, or policy regarding "strip searches of women in the Wayne County Jail." (ECF No. 42, PageID.1064 (quotation marks omitted).)[2]

But as the Sixth Circuit explained in *Woodall*, purported violations of a jail policy are not capable of class wide resolution. There, Wayne County's official strip search policy prohibited the challenged conduct—separating it from other class

---

[2] Plaintiffs also assert claims under a second *Monell* theory: failure to adequately supervise and train officers. (ECF No. 51, PageID.2668.) It is unclear if they intended to seek class certification under this theory as well. Regardless, the Court's analysis of class certification remains the same.

actions challenging unconstitutional jail policies regarding strip searches. *Woodall*, 2021 WL 5298537, at *4. This meant each strip search conducted in violation of the policy would require "an individualized determination of the balancing of the particular need for the search against the personal intrusion the search entailed." *Id*.

And since the County had implemented its first real policy directives on proper strip searches in 2013, the claims from before and after that time required different evidence to establish a custom or policy. *Id*. The Sixth Circuit noted that these "[i]nsurmountable timing issues" barred class-wide treatment of any *Monell* claims based on an unofficial custom or practice, explaining:

> Wayne County must have had notice of the unconstitutional conduct and been deliberately indifferent to it at the time each class member allegedly suffered the unconstitutional search. Yet what the County did and did not know and what actions it did or did not take in response will almost certainly vary from year to year, month to month, and even day to day. A class member in, say, 2019, might have a stronger or weaker claim of deliberate indifference than a class member in, say, 2014. After all, all of the strip searches that were allegedly unconstitutional and that happened in between those two times perhaps could provide additional evidence to show the County's notice and indifference to the conduct. But that evidence will be irrelevant to a class member's claim in 2014.

*Id*. at *7 (citations omitted).

Similarly here, the Plaintiffs' claims involve individualized questions that make class certification improper. Like in *Woodall*, the official jail policy prohibited most of the challenged conduct, so resolution of each Plaintiff's claim would require an individual assessment of its constitutionality (ECF No. 43-5, PageID.1617–1618 ("[A strip search] is to be conducted by an officer of the same gender as the inmate being searched and out of view of persons of the opposite gender."); *id*. at PageID.1618

8

("Avoid making derogatory comments to the inmate."); *id.* at PageID.1627 ("Security officers of the same sex as the inmate shall conduct strip-searche[s] (in as much privacy as possible). Only same sex officers shall be present during strip searching.").) And like in *Woodall*, the claims eligible for class certification span at least five years: from April 27, 2020, to present. (ECF No. 27, PageID.312 ("The parties agree … that Plaintiffs are barred from bringing a class action for claims that accrued before April 27, 2020.").) What the County was aware of in 2020 is likely different from what it is aware of today, making the practice/custom argument unique to each Plaintiff. (ECF No. 42, PageID.1051–1052.)

In short, because the nature of Plaintiffs' injuries vary such that their *Monell* claims cannot be resolved "in one stroke," commonality is not met. *Wal-Mart*, 564 U.S. at 350. Without meeting the commonality requirement, class certification fails. But the Court will discuss why the other Rule 23(a) requirements are not met either.

### 3. Typicality

The question of typicality often overlaps with commonality. "[I]t asks whether the claims 'of the representative parties are typical of the claims . . . of the class.'" *Woodall*, 2021 WL 5298537, at *4 (quoting Fed. R. Civ. P. 23(a)(3)) (alteration in original). The typicality requirement can be stated as follows: "as goes the claim of the named plaintiff, so go the claims of the class." *Sprague v. Gen. Motors Corp.*, 133 F.3d 388, 399 (6th Cir. 1998) (en banc); *see also Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 561 (6th Cir. 2007) ("The typicality requirement is not satisfied when a plaintiff

can prove his own claim but not necessarily have proved anybody else's claim." (citation and quotation marks omitted)).

For the same reasons just explained, typicality is not met here. Given the individualized nature of each claim, the named Plaintiffs could show that their own strip searches were unconstitutional and could even show that the county was liable for them under *Monell* without proving those claims for the rest of the class. True, the Plaintiffs here do not suffer from the same problem in *Woodall*, where the named plaintiffs' claims all accrued before the class claims' statute of limitations cutoff. *Woodall*, 2021 WL 5298537, at *4. But the other issues remain: whether legitimate penological interests justified the need for particular strip searches must be determined on an individual basis.

### 4. Adequacy

The adequacy requirement has two elements: (1) the class representatives must have common interests with the unnamed members of the class, and (2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel. *See Gonzales v. Cassidy*, 474 F.2d 67, 73 (5th Cir. 1973); *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976). The parties do not dispute that Plaintiffs' counsel is qualified and will vigorously prosecute the interests of the class. Defendants dispute, however, the first requirement that Plaintiffs themselves are adequate representatives because "the resolution of their individual claims would not necessarily resolve the claims of the class members." (ECF No. 53, PageID.4299.) Indeed, the Sixth Circuit has held "[t]he adequate representation

10

requirement overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentives to pursue the claims of the other class members." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1083 (6th Cir. 1996). Because each claim depends on individualized questions of fact, the Plaintiffs are not adequate representatives of the class.

## B. 23(b) Requirements

Even assuming Plaintiffs met the prerequisites of Rule 23(a), each proposed class would also have to fall into at least one of the categories in Rule 23(b). Here, Plaintiffs seek certification under Rules 23(b)(1)(A)[3] and 23(b)(3). (ECF No. 42, PageID.1069.)

Starting with Rule 23(b)(1)(A), a class action can be maintained if "prosecuting separate actions by or against individual class members would create a risk of: . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class." Fed. R. Civ. P. 23(b)(1)(A). This provision is generally not applicable where

---

[3] Plaintiffs purport to seek certification under Rule 23(b)(1) generally but then focus their arguments on 23(b)(1)(A) only. (ECF No. 42, PageID.1069–1070.) To the extent they may have been seeking certification under 23(b)(1)(B), they have waived this argument. *See Kennedy v. Comm'r of Soc. Sec.*, 87 F. App'x 464, 466 (6th Cir. 2003) ("[I]ssues which are 'adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.'" (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996))). What is more, 23(b)(1)(B) is inapplicable here. As Defendants explain (*see* ECF No. 53, PageID.4302–4303), Rule 23(b)(1)(B) applies primarily where plaintiffs seek individual monetary relief from a limited fund, *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 614 (1997), for example, where a class consists of "claimants to trust assets, a bank account, insurance proceeds, [or] company assets in a liquidation sale," *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 834 (1999). Here, there is no allegation of a limited fund.

Plaintiffs seek monetary damages. *See Casa Orlando Apartments, Ltd. v. Fannie Mae*, 624 F.3d 185, 197 (5th Cir. 2010) ("[C]ertification under (b)(1)(A) is seldom appropriate when dealing with monetary compensation because no inconsistency is created when courts award varying levels of money damages to different plaintiffs."); *see also Zinser v. Accufix Rsch. Inst., Inc.*, 253 F.3d 1180, 1193 (9th Cir. 2001) ("Certification under Rule 23(b)(1)(A) is therefore not appropriate in an action for damages."). Additionally, a 23(b)(1)(A) class is designed to prevent a defendant from having to perform under inconsistent judgments—but as previously explained, the class members' claims here do not rise and fall as one. It is entirely possible that the County is liable for some violations but not others. "The fact that some plaintiffs may be successful in their suits against a defendant while others may not is clearly not a ground for invoking Rule 23(b)(1)(A)." *In re Bendectin Prods. Liab. Litig.*, 749 F.2d 300, 305 (6th Cir. 1984).

That leaves Rule 23(b)(3). This provision allows a class action to be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Notably, "subdivision (b)(3) contains the more stringent requirement that common issues 'predominate' over individual issues." *Woodall*, 2021 WL 5298537, at *5 (citing *Comcast Corp. v. Behrend*, 569 U.S. 27, 34 (2013)). A common issue is one "where the same evidence will suffice for each member to make a prima facie showing or the issue is susceptible to generalized, class-wide proof,"

while an individual issue is one where "the plaintiffs 'will need to present evidence that varies from member to member.'" *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S 442, 453 (2016)). To determine whether common issues predominate, courts consider factors such as:

> (A) the class members' interest in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the likely difficulties in managing a class action.

*Id.* In other words, common issues predominate when "class members 'will prevail or fail in unison.'" *Id.* (citing *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 460 (2013)).

Predominance presents the biggest obstacle for Plaintiffs. Even if Plaintiffs' *Monell* claims raised common issues, the individualized questions overwhelm any common ones. As the Sixth Circuit explained in *Woodall*, under the pattern or practice theory of *Monell* liability, Plaintiffs would have to demonstrate:

> (1) the existence of a clear and persistent pattern of illegal activity; (2) notice or constructive notice on the part of defendant; (3) the defendant's tacit approval of the unconstitutional conduct, such that their deliberate indifference in their failure to act can be said to amount to an official policy of inaction; and (4) that the defendant's custom was the "moving force" or direct causal link in the constitutional deprivation.

*Id.* at *6. And even if the first element—a clear pattern of unconstitutional strip searches—could be established for each of the four subclasses, as the Sixth Circuit noted, "that is the only element that could conceivably be resolved in this common fashion." *Id.* at *7. As discussed, the five-year time span of class members' claims

13

makes the second and third elements an individualized inquiry. *Id*. ("[W]hat the County did and did not know and what actions it did or did not take in response will almost certainly vary from year to year, month to month, and even day to day."). And the fourth element is an individualized inquiry as well—as the Sixth Circuit further explained in *Woodall*:

> [I]t is not enough to show generically that the County had a policy of acting with deliberate indifference toward the four types of unconstitutional strip searches (which were allegedly conducted in violation of its formal policies). Rather, a class member must also show that the class member was herself subjected to a "constitutional deprivation" in the way that she was searched. *See* [*Thomas*, 398 F.3d] at 429. And the class member must then show a "direct causal link" between the County's general policy of deliberate indifference and this constitutional violation. *Id*. In that respect, just because a policy exists does not mean it caused the particular class member's harm. As we have said, there is an "analytical distinction" between the general policy and the specific constitutional violation. *Doe v. Claiborne County*, 103 F.3d 495, 508 (6th Cir. 1996). "A municipality could be found to have a policy of failing to act in the face of repeated constitutional violations. But it could also be found to have acted reasonably, or even negligently, in a particular case, thus precluding liability." *Id*. at 508–09. So, this causation question would have to be decided on an individual basis, too. *Cf. Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1235-37 (11th Cir. 2016); *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 479-80 (8th Cir. 2016); *Stout*, 228 F.3d at 718.

*Id*. Lastly, the issue of damages would also have to be decided on an individualized basis. It is true that "individual damages determinations *alone* do not make individual issues predominate over common ones." *Id*. at *8; *see, e.g.*, *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 988–89 (11th Cir. 2016) (collecting cases). But damages are at least relevant to the predominance inquiry and can "defeat predominance when they are accompanied by significant individualized questions going to liability." *Brown*, 817 F.3d at 1240 (citation omitted). That is the case here.

Accordingly, because individual issues predominate over any common issues, certification under Rule 23(b)(3) is not appropriate. And because Plaintiffs have not met the standards for class certification under Rules 23(a) or 23(b), class certification is denied.

### III. Motion for Summary Judgment

Next, the Court turns to the Defendants' motion for summary judgment. Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Or, stated less formally, Defendants are entitled to summary judgment only if no reasonable jury could find in favor of Plaintiffs. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). In making this determination, the Court must view facts in the record, and the reasonable inferences that can be drawn from those facts, in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). On summary judgment, the Court does not weigh evidence, assess credibility of witnesses, or determine the truth of matters in dispute. *Anderson*, 477 U.S. 242 at 249.

### A. Qualified Immunity

Graham seeks summary judgment based on qualified immunity.

To overcome such a defense, "a plaintiff must establish (1) that the defendant violated a 'constitutional right' and (2) that the right 'was clearly established.'" *Leary v. Livingston County*, 528 F.3d 438, 441 (6th Cir. 2008) (quoting *Saucier v. Katz*, 533

U.S. 194, 201 (2001)). District courts may address these two questions "in any order." *Martin v. City of Broadview Heights*, 712 F.3d 951, 957 (6th Cir. 2013). "Yet the qualified-immunity defense does not change the normal summary-judgment rules." *Gambrel v. Knox County*, 25 F.4th 391, 400 (6th Cir. 2022). So when deciding whether a strip search was reasonable or whether Sixth Circuit "precedent clearly established that result," this Court "must view genuine factual disagreements in the light most favorable to the plaintiff." *Id*. And "[i]f a reasonable jury could credit the plaintiff's version of events and if that version clearly shows [a constitutional violation, the Court] cannot grant the officers summary judgment." *Id*.

### 1. Constitutional Violation

Plaintiffs assert that Graham conducted unreasonable searches of them in violation of the Fourth Amendment. To determine whether a particular search violates the Fourth Amendment, the Court must "balance the nature of the intrusion against the need for the particular search." *Sumpter v. Wayne County*, 868 F.3d 473, 480 (6th Cir. 2017). The Fourth Amendment's protection extends to people who are incarcerated, though this protection is limited by the "legitimate goals and policies of the penal institution." *Id.* at 481 (citing *Bell v. Wolfish*, 441 U.S. 520, 546 (1979)). And while "a strip search, by its very nature, constitutes an extreme intrusion upon personal privacy, as well as an offense to the dignity of the individual," *Stoudemire v. Mich. Dep't of Corr.*, 705 F.3d 560, 572–73 (6th Cir. 2013), the Supreme Court has held that prison officials may perform strip searches (consisting of visual inspection only) of detainees entering prison without needing individualized suspicion, *Florence*

16

*v. Bd. of Chosen Freeholders*, 566 U.S. 318, 339 (2012). This is the type of search that Graham primarily conducted. "Graham worked at registry, so the strip searches she conducted were done to make sure that detainees entering the general population were not bringing in any contraband." *Woodall v. Wayne County*, 590 F. Supp. 3d 988, 1001 (E.D. Mich. 2022). Thus, "[t]he constitutional issue in [this] case is not whether Graham was permitted to conduct a strip search, but whether she conducted the search in a reasonable manner consistent with the Fourth Amendment," *id.*, i.e., in a manner that "struck a reasonable balance between inmate privacy and . . . legitimate penological interests," *Sumpter*, 868 F.3d at 481–82.

As noted above, whether each Plaintiff's strip search was conducted in a reasonable manner will depend on the individual facts and circumstances of that search. In conducting this reasonableness analysis, courts consider the circumstances of the search, including the privacy of the search, the location where it is conducted, and the officer's conduct while performing the search. *Woodall*, 590 F. Supp. 3d at 1001. Broadly speaking, Plaintiffs allege they were strip searched in front of men, strip searched in groups, exposed to other inmates' bodily fluids, and that Graham would make derogatory or sexual comments to them during the searches. (*See* ECF No. 51-25, PageID.4260–4268.) They put forth evidence of the same, in the form of declarations (ECF No. 51-24.) Taking this evidence in the light most favorable to the Plaintiffs, these searches were intrusive. *See, e.g., Stoudemire*, 705 F.3d at 572–73 ("[A] strip search is more invasive when it is performed where other people can see the person being stripped."); *Sumpter*, 868 F.3d 473, 483 ("Intrusive under ideal

17

circumstances, strip searches are especially humiliating when they are conducted in front of other inmates: The wider an audience for a strip search, the more humiliating it becomes, especially when the stripped individual is exposed to bystanders who do not share the searching officers' institutional need to view her unclothed. The same applies to strip searches conducted in a discourteous manner." (citations and internal quotation marks omitted)); *Salem v. Mich. Dep't of Corr.*, 643 F. App'x 526, 529 (6th Cir. 2016) (holding that strip searches performed in front of other prisoners and in "unsanitary conditions," including exposure to bodily fluids of other prisoners, were "exceedingly intrusive").

But this does not end the inquiry. Again, the Fourth Amendment balances the level of intrusion against the need for the search. *Sumpter*, 868 F.3d at 483 (citing *Florence*, 566 U.S. at 326–28) ("An intrusive search is not necessarily an unreasonable one, especially in the corrections setting, where an inmate's interest in being free from privacy invasions must yield to the realities of operating a safe and effective corrections system."). So the question is whether these intrusive searches were "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). In making this determination, courts examine whether there are "'obvious, easy alternatives' that accommodate the inmate's privacy interests at little cost to valid penological objectives." *Salem*, 643 F. App'x at 530 (quoting *Williams v. City of Cleveland*, 771 F.3d 945, 950 (6th Cir. 2014)).

During her deposition, Graham did not provide any penological justification for conducting strip searches in front of men—instead she says these things never

occurred. (ECF No. 43-7, PageID.1872.) This material fact dispute is not for the Court to resolve. Graham did admit, however, to operating a snack shop open to both male and female employees within the registry room. (ECF No. 43-7, PageID.1870 (detailing Graham's testimony that the snacks are in the "registry bubble" and jail employees put money "in the file cabinet" located in "the registry room" where strip searches are conducted).) Numerous Plaintiffs recall times when they were strip searched in front of men, including when male officers came by to purchase snacks from Graham. (ECF No. 51, PageID.2666–2667.) A reasonable jury could credit this evidence. Absent any such penological justification, strip searches in front of members of the opposite sex are unconstitutional. *See Cornwell v. Dahlberg*, 963 F.2d 912 (1992).

Likewise, strip searches permeated with derogatory comments are unconstitutional. *Cf. Stoudemire*, 705 F.3d at 573 (noting that the fact that a guard "smirked" while strip searching the plaintiff was not dispositive, but that the smirk "may, in context, suggest personal animus and implicate the dignitary interest 'inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches'" (quoting *Brannum v. Overton Cnty. Sch. Bd.*, 516 F.3d 489, 499 (6th Cir. 2008))). And Graham did not provide any penological justification for her alleged use of derogatory comments. Again, she denied this wholesale. (ECF No. 43-7, PageID.1884–1894 (denying "us[ing] the P word to refer to women's private parts," calling an inmate "sexy body," or "comment[ing] about the size of the inmates' breasts" during strip searches). Because there are numerous plaintiff affidavits to the

contrary this creates a quintessential fact issue precluding summary judgment. (ECF No. 51, PageID.2651–2652, 2666.)

Graham also denies that she strip-searched Plaintiffs in groups. (ECF No.43-07, PageID.1834–1835.) But "even if she did," say Defendants, she had "a legitimate justification." (ECF No. 43, PageID.1552.) This was "to complete the process as quickly and efficiently as possible to avoid inmate "attitudes" from long waits, or to expeditiously process an inmate who was "not feeling well or detoxing." (*Id.* at PageID.1552–1553.) But generalized justifications for conducting a group strip search will not suffice; there must be reasons justifying "the need for the *particular* search" at issue. *Stoudemire*, 705 F.3d at 573–74 (quoting *Bell*, 441 U.S. at 559) (collecting cases on exigent circumstances that could justify a strip search in view of others, such as a riot situation or when the only alternative search location would threaten officer safety).

And Plaintiffs present evidence that group searches stalled, rather than expedited, the intake process. They say that Graham often made them wait, sometimes for many hours, for more inmates to arrive before strip searching them in a group. (ECF No. 51, PageID.2657.) For instance, Plaintiff Krista Anson recalled, "before they would do strip search[es], they would wait until they got more people . . . they would wait until more women came so they [could] strip search us together." (ECF No. 51-10, PageID.3416.) Plaintiff Sharnea McCoy likewise explained, when one woman asked, "do we have to do this in front of each other?" Graham responded that there was "no privacy in jail." (ECF No. 42-5, PageID.1395.)

20

Other Plaintiffs report similar experiences in their declarations. (ECF No. 51, PageID.2665–2666.) Based on this evidence, a reasonable juror could conclude, as Plaintiffs argue, that "Graham performed group strip searches for her own convenience," in disregard of Plaintiffs' privacy interests and not for the penological interests Defendants cited. (ECF No. 51, PageID.2658.)

Moving on to Plaintiffs' claims regarding unhygienic searches, Graham denies that she made menstruating women take their pads out or that inmates were exposed to others' bodily fluids. (ECF No. 43-7, PageID.1842); (ECF No. 43, PageID.1551.) Instead, she says she required detainees to lower their pads between their legs, and that she has found "a lot of contraband" from these searches. (ECF No. 43-6, PageID.1685.) But Plaintiffs recall being forced to remove tampons in front of other prisoners, being searched in a room with strangers' blood on the floor (and bleeding on the floor themselves), and not being provided with new pads or tampons after the search. (ECF No. 51-25, PageID.4263–4265.) These unhygienic conditions would "amplify [the] invasiveness" of the searches. *Salem*, 643 F. App'x at 529.

When asked about these accounts, Graham said, "just because they are saying it doesn't mean it's true." (ECF No. 43-6, pageID.1748.) Fair enough. But at summary judgment, the "evidence offered by the nonmovant must be accepted as true . . ." *Hostettler v. Coll. of Wooster*, 895 F.3d 844, 852 (6th Cir. 2018). As such, a reasonable jury could conclude that this method of strip searching is not reasonably related to protecting health and safety. True, "'detect[ing] and deter[ing] the possession of contraband' is a legitimate penological objective." *Stoudemire*, 705 F.3d at 573

21

(alterations in original) (quoting *Florence*, 566 U.S. at 328). But this could be accomplished while also maintaining a hygienic environment—for example, by conducting individual strip searches, providing new feminine hygiene products after the search, and cleaning the room in between searches.

In short, viewing the evidence in the light most favorable to the Plaintiffs, there is a genuine dispute of material fact as to whether Graham conducted unconstitutional strip searches of the Plaintiffs.

### 2. Clearly Established

The next question is whether the law was clearly established that conducting strip searches in this fashion was unconstitutional. Graham says no. (ECF No. 43, PageID.1553.) This Court has already said yes.

As the Court explained when rejecting this same argument from Graham in *Woodall*, it was clearly established by at least 2013, when the Sixth Circuit decided *Stoudemire*, that detainees have a constitutional right to be free from strip searches conducted in front of other detainees and accompanied by derogatory comments that are not reasonably related to a legitimate penological justification. *Woodall*, 590 F. Supp. 3d at 1003 ("The Sixth Circuit has held that 'the right not to be subjected to a humiliating strip search in full view of several (or perhaps many) others unless the procedure is reasonably related to a legitimate penological interest' is clearly established." (quoting *Stoudemire*, 705 F.3d at 575)); *see id.* at 1004 (explaining that "when analyzing whether a constitutional violation occurred, the *Stoudemire* Court stated, 'it is settled that the law demands an adequate need for a strip search, and,

depending on the circumstances and context, restricts the scope, manner, and place of the search'"); *Sumpter*, 868 F.3d at 487 (explaining that "the clearly established right recognized in *Stoudemire*" was the right to be free of "a public strip search 'devoid' of justification"); *see also Salem v. Mich. Dep't of Corr.*, No. 13-14567, 2015 WL 1966727, at *19 (E.D. Mich. May 1, 2015) ("[The] right to be free from a strip search that was performed in full view of other prisoners . . . was well-established in 2009 . . . ."), *aff'd in part*, 643 F. App'x 526 (6th Cir. 2016). This Court described the facts in *Stoudemire* and how they related to the facts in *Woodall*:

> Stoudemire was strip searched in front of unblocked windows where others could see the search, which the Court found added to the already "extreme invasion" of Stoudemire's Fourth Amendment rights. *Stoudemire*, 705 F.3d at 573. On top of that, Stoudemire stated that the officer "smirked" during the search, which the Court found implicated "the dignitary interest inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches." *Id.*

> These facts align with [Plaintiff's] testimony about how Graham conducted strip searches—in view of other detainees and accompanied by derogatory comments. (ECF No. 91-6, PageID.2859.) And *Stoudemire* was decided a year before the January 2014 searches of [Plaintiff], so it would have provided Graham notice that group strip searches devoid of any penological interest are unconstitutional. *See Stoudemire*, 705 F.3d at 575.

*Woodall*, 590 F. Supp. 3d at 1003 (citation modified).

As she did in *Woodall*, Graham resists this conclusion by relying on *Sumpter*, a 2017 case in which the Sixth Circuit found that she was entitled to qualified immunity under the clearly established prong. (*Id.*) But this argument fails for the same reason it did in *Woodall*:

> Graham ignores an important distinction the Sixth Circuit made when determining that *Stoudemire* did not clearly establish the violation

23

alleged by *Sumpter*. Specifically, the Court in *Sumpter* stated that in *Stoudemire*: there was no penological justification for the particular searches at issue. This critical difference makes *Stoudemire* . . . [a] poor template[] for declaring the particularized right at issue in this case—freedom from a group strip search supported by a legitimate penological justification—clearly established." *Sumpter*, 868 F.3d at 478.

In contrast, as the Court explained previously, Graham does not offer any penological justification for conducting a group strip search of [Plaintiff] in January 2014 or making derogatory comments toward her. Instead, Graham denies that these allegations are true. [citation omitted]. So the conclusion in *Sumpter* that the violation is not clearly established, which is based on the fact that there was an uncontradicted penological interest in support of the group strip searches, is not relevant here where there is not a countervailing interest in the record.

*Woodall*, 590 F. Supp. 3d at 1003–1004.

In short, if Plaintiffs are to be believed, then Graham violated clearly established law by subjecting Plaintiffs to highly invasive strip searches that are not reasonably related to a penological interest.

Thus, taking the facts in the light most favorable to the Plaintiffs, there is a genuine dispute of material fact as to whether Graham violated clearly established law. So Graham is not entitled to summary judgment on the basis of qualified immunity.

## B. *Monell* Claims

Next, the Court addresses Wayne County's argument that it is entitled to summary judgment on Plaintiffs' *Monell* claims.

Local governments cannot be sued under § 1983 based solely on injuries inflicted by their employees or agents. *Monell*, 436 U.S. at 691 ("[A] municipality cannot be held liable under § 1983 on a *respondeat superior* theory."). "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers

24

or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Id.* at 694. Plaintiffs can make this showing in four ways: "(1) the municipality's legislative enactments or official policies; (2) actions taken by officials with final decision-making authority; (3) a policy of inadequate training or supervision; or (4) a custom of tolerance or acquiescence of federal violations." *Winkler v. Madison County*, 893 F.3d 877, 901 (6th Cir. 2018).

Plaintiffs are not relying on the first two avenues to make their *Monell* claim. Instead, they allege a custom of acquiescence to constitutional violations and inadequate training. Plaintiffs argue that the County, despite policies on the books, has a custom of tolerance or acquiescence to unconstitutional strip searches at the Jail. In other words, even though conducting unconstitutional strip searches has "not received formal approval through the body's official decision-making channel," *Monell*, 436 U.S. at 691, the County is liable, argue Plaintiffs, because "the relevant practice is so widespread as to have the force of law," *Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 404 (1997); *see Connick v. Thompson*, 563 U.S. 51, 61 (2011) ("Official municipal policy includes . . . practices so persistent and widespread as to practically have the force of law".). Plaintiffs further argue that the County failed to train and supervise employees, specifically Graham, on proper strip search practices. The Court will address each theory in turn.

### 1. Custom or policy of acquiescence to constitutional violation

To prevail on a theory that the County had a custom of tolerance or acquiescence to federal violations, Plaintiffs must show:

> (1) 'a clear and persistent' pattern of unconstitutional conduct by [county] employees; (2) the [county's] 'notice or constructive notice' of the unconstitutional conduct; (3) the [county's] 'tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction'; and (4) that the policy of inaction was the 'moving force' of the constitutional deprivation, such that the plaintiff's constitutional injury was directly caused by the conduct of the [county] rather than simply by the conduct of the [county] employee.

*D'Ambrosio v. Marino*, 747 F.3d 378, 387–88 (6th Cir. 2014) (citing *Claiborne County*, 103 F.3d at 508). The Court will consider each of these factors as well.

### Clear and persistent pattern

For a clear and persistent pattern of unconstitutional conduct, there must be a "repetition of similar events." *Sistrunk v. City of Hillview*, 545 F. Supp. 3d 493, 503 (W.D. Ky. 2021) (citing *Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013)); *see also, Thomas v. City of Chattanooga*, 398 F.3d 426, 430 (6th Cir. 2005) (finding prior incidents too dissimilar to establish a pattern because they ranged "from a shooting to a broken fingernail").

Plaintiffs submitted 160 declarations from former inmates attesting to being strip-searched in the following ways: "(1) in the presence, or public viewing, of male officers; (2) in groups with numerous inmates who didn't share any penological interest in viewing each other in a state of undress; (3) under unsanitary or unhygienic conditions; and/or, (4) subject to derogatory gender-bias comments by Defendant Graham." (ECF No. 51, PageID.2669, 2676–2683.) They also point to prior lawsuits including hundreds of other declarations alleging the same unconstitutional conduct at the same facility carried out by the same person.

26

The County seems to only contest a pattern as to sanitation and linen exchange searches.[4] (ECF No. 43, PageID.1538–1539.) It sees "only evidence of at most six or seven alleged instances" of sanitation searches and linen exchange searches in front of men, which occur in cells, not at the registry. (*Id.*) But they do not explain why the Court should not consider all of the categories of similar types of searches together, And Plaintiffs do not count these allegations separately and presumably consider them as searches "in the presence, or public viewing, of male officers." (ECF No. 51, PageID.2669.)

But even if the Court accepted the County's characterization, six or seven alleged instances are not too few to support the establishment of a pattern. For example, "a record of approximately 14 instances of similar abuse in a two-year period" may establish a pattern, *Leach v. Shelby Cnty. Sheriff*, 891 F.2d 1241, 1247 (6th Cir. 1989), but two to three instances generally do not, *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 701 (6th Cir. 2006); *cf. Rodgers v. County of Oakland*, No. 18-12832, 2021 WL 5280075, at *8–10 (E.D. Mich. Nov. 12, 2021) (finding plaintiff's reliance on one dissimilar incident that occurred two years prior was insufficient to survive summary judgment) (collecting cases).

Therefore, as in *Woodall*, "[t]here is ample evidence of a clear pattern of federal violations." *Woodall*, 590 F. Supp. 3d at 1008. Plaintiffs have submitted hundreds of

---

[4] Sanitation searches are unannounced searches of the cell and the inmate's person to look for contraband. (ECF No. 43 at PageID.1525.) Linen exchange searches require an inmate to undress in her cell to receive a clean uniform. (*Id.* at PageID.1526.)

declarations which, if credited, show that their Fourth Amendment rights were violated. "Therefore, Plaintiffs have met their summary-judgment burden of creating a genuine dispute of fact over whether there exists a clear or persistent pattern of violations." *Id.* at 1009.

## Notice

The allegations of improper strip searches span from 2016 to 2022. (ECF No. 27). The County says it implemented multiple policy changes prohibiting such conduct throughout this time (ECF No. 43, PageID.1531–1532 (detailing policy changes in November 2013, May 2019, and June 2019)). So the question is whether the County had notice or constructive notice that unconstitutional strip searches were being conducted when these searches allegedly occurred. *See D'Ambrosio*, 747 F.3d at 388 ("The county cannot have tacitly approved an unconstitutional policy of which it was unaware."). On this point the Court finds that there is a genuine dispute of material fact.

For starters, Plaintiffs point to several prior lawsuits alleging improper strip searches by Graham at the Jail from at least 2012 through 2020. ((ECF No. 43-4, PageID.1604–1610) (citing *Weathington* (2012); *Sumpter* (2014); Woodall (2017); and *Hogan/Cobbs* (2020)); ECF No. 51, PageID.2670–2673, 2675.) Many of the Plaintiffs here were putative class members in these previous suits, and in those suits they provided declarations detailing their complaints regarding how they were strip searched, which the County reviewed.

True, the County made changes to its strip search policy in November 2013, May 2019, and June 2019. (ECF No. 43, PageID.1531–1532.) These policy changes included that "[t]he search shall be conducted out of view of persons of the opposite gender"; "[t]he search shall be conducted in privacy"; "the searching officer(s) must be professional at all times" (*id.* at PageID.1926); "[t]he search will be conducted by an Officer of the same gender as the inmate being searched;" (*id.* at PageID.1945–1969); and "[e]ffective immediately male officers are restricted from entering [certain] areas of the Female Registry" (*id.* at PageID.1971). The County claims it was not on notice that violations continued after these policy changes. (*Id.* at PageID.1531–1532.)

But the record before the Court supports that complaints persisted after the November 22, 2013, May 8, 2019, and June 24, 2019, policy changes. As noted, lawsuits were filed before and after these policy changes, including a 2020 lawsuit with allegations dating through March 2020. (*See e.g.* ECF No. 43-4, PageID.1604 (copy of *Hogan/Cobbs* complaint)). And "there are approximately 85 Plaintiffs in this case who have attested to the fact that they complained, tried to complain, filed a grievance, or tried to file a grievance with jail staff about the manner in which they were being strip searched." (ECF No. 51, PageID.2675; *see* ECF Nos. 51-8, 51-9.) These accounts continue up through 2019 and raise very similar complaints to those raised in the previous lawsuits. For example, one grievance on file from March 1,

2020, claimed that there were "[m]en in bubble during linen and clothes change."[5] (ECF No. 43-9, PageID.2000.)

Additionally, for the reasons explained above in denying Plaintiffs' motion for class certification, the County's notice, even after the various policy changes, is a fact-specific inquiry unique to each Plaintiff's search. It does not lend itself to summary judgment.

At bottom, there is a genuine dispute of material fact as to whether the County was on notice that the violations continued after the policy changes.

## Deliberate indifference

The next element of Plaintiffs' custom claim is whether the County tacitly approved or acted with deliberate indifference towards the unconstitutional strip searches.

Deliberate indifference "requires proof that the municipality was aware of prior unconstitutional actions by its employees and failed to take corrective measures." *Miller v. Calhoun County*, 408 F.3d 803, 815 (6th Cir. 2005) (citing *Brown,* 520 U.S. at 410). It "does not mean a collection of sloppy, or even reckless, oversights." *Cf. Claiborne County*, 103 F.3d at 508 (applying the standard to a custom claim regarding alleged sexual abuse). So "the risk of a constitutional violation arising . . . must be 'plainly obvious.'" *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir. 2006) (citing *Brown*, 520 U.S. at 412).

---

[5] This appears to be the same allegation from March 2020 included in the *Hogan/Cobbs* lawsuit.

This inquiry is more complicated because the County did not fail to act in response to Plaintiffs' complaints. Indeed, it is undisputed that the County changed its strip search policy in 2013 and twice in 2019. (ECF No. 43, PageID.1531.) This has narrowed the deliberate indifference inquiry before.[6]

But these policy changes, however well-intentioned, do not preclude a fact issue on deliberate indifference. A reasonable juror could find that authorizing Graham—someone accused of conducting improper searches by hundreds of women even after prior policy changes—to continue conducting most of the strip searches at the Jail creates a risk of further unconstitutional searches. *Brown*, 520 U.S. at 412. In fact, one could say it "disregard[s] a known or obvious consequence of [that] action." *Miller*, 408 F.3d at 803.

The County also points to various "corrective actions" taken "to ensure compliance with these policies" (ECF No. 43, PageID.1526, PageID.1526.) In 2017,

---

[6] In *Woodall*, the Court found there was no deliberate indifference for a 2014 allegation that occurred soon after the County's 2013 policy directive. 590 F. Supp. 3d 988, 1011–16 (E.D. Mich. 2022) (explaining that the deliberate indifference inquiry for the 2014 allegation was "narrower" because "of the intervening policy change where the County did act"). Defendants rely on *Woodall* to frame their policy directives as foreclosing any possible deliberate indifference here. (ECF No. 43, PageID.1535.) But *Woodall* is distinguishable,

There, the Court considered the 2013 policy change to be a significant action taken by the County because it was the first directive prohibiting group strip searches and searches in view of others, *Woodall*, 590 F. Supp. 3d at 955 (prior policy simply asked officers to conduct individual strip searches "when possible"), and there was only one plaintiff with one allegation from after the policy change. *id.* at 1011–113. This case, by contrast, includes three policy changes (November 2013, May 2019, and June 2019) and yet still hundreds of declarations alleging inmates were subjected to unconstitutional strip searches by officer Graham between 2014 and 2022. (ECF No. 14).

says the County, it "add[ed] personnel to help with processing personal property at the Registry, thereby reducing the likelihood of strip searching inmates in groups because of backups from lengthy processing times." (*Id.* at PageID.1534.) It also says that in 2018, the Jail painted the windows of the change out room to obscure the view into the room. (*Id.* at PageID.1526.) And in 2019, the Jail installed cameras in the registry. (*Id.*)

Plaintiffs challenge the efficacy of these corrective measures. To start, they say adding personnel to reduce processing times did not address the issue because even at low volume times, instead of searching inmates one-by-one, Graham was waiting until "the bullpen was full" and then conducting a group strip search. (*See* ECF No. 51, PageID.2664 (summarizing deposition from Plaintiff Anson, who was searched both before and after the 2017 change).) Next, Plaintiffs dispute that the County painted over the windows in the change out room and provided a photo of the window unpainted and unfrosted. (*Id.*; ECF No. 52.)

The Court also considers that, against any corrective measures, Graham operated an unofficial snack shop open to both male and female employees in the same room where strip searches took place. Plaintiffs allege that the snack shop "attracted male officers to the registry room" resulting in their viewing strip searches. (ECF No. 51, PageID.2677 ("there were times the male officers came to buy chips and pop while we were standing there naked.").) Graham confirmed that she has been selling snacks there since "'02, '03, '04" and that her supervisors knew about it and did not tell her to stop. (ECF No. 43-7, at PageID.1870–1872 ("They're all aware. They

32

bought snacks, too.")) Given the obvious risk of male officers viewing strip searches when buying snacks in the location where these searches occurred, *Gregory*, 444 at 752, a reasonable jury could find deliberate indifference.

As one final point, Plaintiffs provide numerous declarations that deficiencies in the Wayne County Jail's grievance process made it nearly impossible to report incidents of improper strip searches. (ECF No. 51, PageID.2676 n.8.) This is further evidence of deliberate indifference. *Cf. Leach*, 891 F.2d at 1248 ("Further evidence of a policy of deliberate indifference is found in the Sheriff's failure to investigate this incident and punish the responsible parties."); *see also Davis ex rel. LaShonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 654 (1999) ("The complaint also suggests that petitioner may be able to show both actual knowledge and deliberate indifference on the part of the Board, which made no effort whatsoever either to investigate or to put an end to the harassment.").

Viewing the evidence in the light most favorable to the non-moving Plaintiffs, a reasonable jury could find that, even after policy changes, the County acted with deliberate indifference in failing to limit or remove Graham from strip search duties or provide a legitimate process to report violations.

### Causation

Finally, the County's custom must cause the constitutional injury. *See Blackmore v. Kalamazoo County,* 390 F.3d 890, 900 (6th Cir. 2004) ("A municipality can be liable . . . . only if the plaintiff can demonstrate that his civil rights have been violated as a direct result of that municipality's policy or custom."). It must be both

the "but for" and proximate cause of the constitutional violation. *Powers v. Hamilton Cnty. Pub. Def. Comm'n*, 501 F.3d 592, 608–09 (6th Cir. 2007).

According to the County, it "took several actions to deter any allegedly unconstitutional conduct," including "[t]he policy changes [that] expressly forbid the activity complained of here," and "steps outside the policy changes to ensure the policies would be implemented." (ECF No. 43, PageID.1537.) But that merely reargues whether there was deliberate indifference. And Plaintiffs have presented sufficient evidence to create a fact issue.

In sum, a reasonable jury could conclude that the County had a custom of acquiescence towards unconstitutional strip searches.

### 2. Failure to train or supervise

Plaintiffs also seek *Monell* liability under a failure to train or supervise theory.[7] The question here is whether "in light of the duties assigned to specific officers or employees the need for more or different training [or supervision] is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the [County] can reasonably be said to have been deliberately indifferent to the need." *City of Canton v. Harris*, 489 U.S. 378, 390 (1989).

---

[7] A failure to supervise claim is often analyzed alongside a failure to train claim. *See Ouza v. City of Dearborn Heights*, 969 F.3d 265, 274 (6th Cir. 2020). But it can be analyzed separately. *See S.M. v. Lincoln County*, 874 F.3d 581, 587 (8th Cir. 2017). Here, the parties analyze the failure to train and supervise claim as one, so the Court will do the same.

Before even getting to the elements, the County argues that Plaintiffs' claim fails because it focuses only on Graham. True, a failure to train claim deals with the County's shortcomings, not those of a single office. *Harris*, 489 U.S. at 390–91 ("That a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality] . . . ."). As the Court found in *Woodall*, and as Graham's 2022 testimony confirms, "Graham . . . . conducted at least half, if not more, of the strip searches." (S*ee* ECF No. 43-7, PageID.1825, 1836); *Woodall*, 590 F. Supp. 3d at 1010. Several Plaintiffs also testified that officers other than Graham were involved or complicit in the alleged conduct. (ECF No. 51, PageID.2687–2699 (detailing depositions alleging that various sergeants were involved in unconstitutional strip searches).) So evidence about Graham's training is "probative of a general lack of training of the officers." *Woodall*, 590 F. Supp. 3d at 1010.

To show that the County is liable under *Monell* based on a failure to train claim, Plaintiffs must establish that "(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury." *Ouza*, 969 F.3d at 286–87.

### Adequate training

The first element concerns the "adequacy of the training program in relation to the tasks the particular officers must perform." *Harris*, 489 U.S. at 390. This is an "objectively reasonable" test, "not merely a post hoc assumption that, because a harm

occurred, the training was necessarily inadequate. . . ." *Anderson v. Jones*, 440 F. Supp. 3d 819, 836 (S.D. Ohio 2020).

Graham primarily received on the job training at the start of her time at the registry. (ECF No. 43, PageID.1542, 1811.) Such on the job learning counts as training. *Howell v. NaphCare, Inc.*, 67 F.4th 302, 320 (6th Cir. 2023). And, of course, she had access to the County policies and directives. (ECF No. 43, PageID.1529.) The County says this, coupled with various online training courses and Graham's ability to explain the policies, constitutes adequate training. (*Id.* at PageID.1540–1543.)

Adequacy depends on the circumstances. In *Shadrick v. Hopkins County*, prison nurses received on the job training at the start of their employment and were provided with relevant policies and protocols. 805 F.3d 724, 740–41 (6th Cir. 2015). But the Sixth Circuit found this to be inadequate without any "ongoing training program" to guide the nurses on avoiding constitutional violations. *Id.* at 734; *see also Jackson v. City of Cleveland*, 925 F.3d 793, 835–36 (6th Cir. 2019) (finding training program on *Brady* obligations inadequate, despite some "on the job" training and instruction in the manual).

Similarly here, there seems to be a lack of follow-up on avoiding constitutional violations, Indeed, Plaintiffs point to Graham's own admission that she never received any classes on how to conduct strip searches. (ECF No. 51, PageID.2650.) As for Graham's on-line courses, the County provides no more than a list of training titles. *See, e.g.*, ECF No. 43-27, PageID.2467 ("WCSO Registry Training" and "WCSO Sexual Harassment Policy Training 2017")). And the training that Graham can recall

36

is mostly irrelevant to conducting proper strip searches. (ECF No. 43-7, PageID.1843–1844, 1850 (describing yearly classes on "hazards such as responding to an 'overturned truck'" as well as CPR, HIV, tuberculosis, and hepatitis)).

In sum, Graham received *some* training. But fact issues remain as to whether it was adequate on the key duty of conducting constitutional strip searches. (*See, e.g., Gregory*, 444 F.3d at 754.)

### Deliberate indifference

Next, the Court turns to whether the inadequacy of training resulted from the County's deliberate indifference.

Deliberate indifference in this context means that the County "was aware of 'prior instances of unconstitutional conduct' such that it 'was clearly on notice that the training in this particular area was deficient and likely to cause injury' and yet 'ignored a history of abuse.'" *Ouza*, 969 F.3d at 287 (citing *Fisher v. Harden*, 398 F.3d 837, 849 (6th Cir. 2005)). Again, this "requir[es] proof that a municipal actor disregarded a known or obvious consequence of his action." *Fisher*, 398 F.3d at 849.

The County, incorporating its custom argument, says that it was not on notice that the training was deficient and "issued directives and policies" that outlined the proper strip search techniques. (ECF No. 43, PageID.1544–1545.) So, according to the County, the need for more or different training was not "so obvious." (*Id.*) The Court agrees that this is a closer call.

By 2019, the County implemented policies that advised personnel on how to perform strip searches. They should have been understandable to an officer like

Graham. But the Plaintiffs have provided numerous declarations that even after this date, they were subjected to unconstitutional searches. (*See* ECF No. 51, PageID.2683 (Plaintiffs citing 33 new claims since policy changes)); (ECF No. 54, PageID.4415 (Defendants counting 15).) So while the County did issue new strip search "policy directives," a fact issue still remains as to the adequacy of the training of personnel doing them. *See Stucker v. Louisville Metro Gov't*, No-23-5214, 2024 WL 2135407, at *12 (6th Cir. May 13, 2024) (finding a fact issue on failure to train claim because there were persistent incidents of wrongdoing and minimal oversight, showing a "'culture of acceptance' of impropriety" towards constitutional violations).

Given the frequency with which Graham was conducting these screens, a jury could reasonably conclude that there was an obvious risk that inmates' constitutional rights would be violated in the face of deficient training. *See Dodson v. Nava Lopez*, No. 20-12056, 2023 WL 125005, at *7 (E.D. Mich. Jan. 6, 2023) ("Given the frequency with which officers respond to landlord-tenant disputes," the police department's failure to train on landlord-tenant process created "an obvious potential" for constitutional violations).

### Causation

That just leaves causation. And if a reasonable jury could find inadequate training of registry personnel on proper strip searching based on the County's deliberate indifference, they could find this would cause the Plaintiff's constitutional injuries.

## IV. Conclusion

For the foregoing reasons, the Court DENIES Plaintiffs' motion for class certification (ECF No. 42) and DENIES Defendants' motion for summary judgment (ECF No. 43).

SO ORDERED.


Dated: December 23, 2025




s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES DISTRICT JUDGE